Good morning. May it please the Court, I'm Larry Schaefer and I represent the appellant Dr. Sami Said. Our brief and our reply brief goes into great detail about the errors committed below and how those errors involve both misconstruing evidence or construing against my client and misapplying legal standards but I want to focus the time I have today before this panel on the single most important error that we believe supports this appeal and and it is an error that standing alone should result in reversal of the grant of summary judgment and allowing Dr. Said to try his discrimination and retaliation claim and that is the way the district court analyzed the evidence that was presented about the stark and very different treatment between Dr. Said, my client, and Dr. Simon Maltese, who was a colleague of Dr. Said's subject to the exact same supervision and who was in the exact same position as my client. Can I ask just a preliminary question because it wasn't and maybe I just missed it in the briefing. What's the protected ground that your client's relying on? In terms of the retaliation claim, your honor? No, in terms of the discrimination claim. I mean is it race? He is a Muslim. He is a religion. Is that what it is? It was never clear. There are six claims, each the State and Federal counterpart of race, national origin, and religion, your honor. So those three are the protected grounds at issue? That's right. Dr. Said is a Muslim born in Egypt who is African-American. Okay. Okay. Courts and this this circuit has long recognized that that in order to allow disparate treatment to be considered evidence of discrimination, a plaintiff has a burden both in the prima facie case and in the pretext stage of the analysis and demonstrating that the individual to whom the plaintiff is comparing himself who was treated more favorably is similarly situated to the plaintiff. That has been described by this court as a rigorous test, particularly at the pretext stage. And I'm going to go into and I want to explain in detail the precedent that we're relying on that we think this court just simply needs to read and follow to conclude that error was committed below and Dr. Said is entitled to trial. Before I do that, I want to emphasize a couple of bedrock principles underlying  Discrimination and retaliation laws don't just protect employees who have spotless performance records. These protections extend to individuals who may have violated company policy, may have done things wrong. In those cases, an employer has an obligation to ensure that both the investigation into potential wrongdoing and the violation of company policy occur without any discriminatory or retaliatory intent. Dr. Said has offered significant evidence from which a jury could find that may have failed in that obligation. Because of that, he's required to be permitted to try his case. Let me talk about that similarly situated standard. We do it, we've analyzed it thoroughly in the briefs, but there are three in particular, three cases where the analysis is quite thorough on that issue by the 8th Circuit. That is the Lynn v. Deaconess hospital case, Burton v. Arkansas Secretary of State, and Riddout v. JBS USA. Those three cases all involved a plaintiff comparing him or herself to one comparable employee that's not in the protected class and all involved either reversal of memory. But now you said not in the protected class. I thought the other doctor was a foreign Canadian. Well, he's a Canadian, Your Honor, but he's, he's Well, that's national origin. That's not the U.S. counsel. That's a protected category. I would agree, Your Honor. Yeah, percent. Absolutely, I would agree. Does that make a difference, that he's in a protected category, too? Well, we would argue that, and intend to argue at trial, that Dr. Said's status as being particularly from the nation that he is from, Egypt, was, was part of the motivation. Yeah, but does it make a difference about the comparator's national origin? I think, Your Honor, I, I, it certainly wouldn't make any difference because, because Montez is, is not a Muslim, was, was raised Catholic and now identifies as an atheist and is clearly Caucasian. So it wouldn't make a difference on those other two, the other two Meaning Four claims, the state and the federal parallels. I don't know whether it would make a difference on the national origin, but. So, to sort of get to the, to the meat of it as I understand it, isn't there a significant difference between Montez and your client in terms of the number, seriousness, and persistence of the unwanted sexual harassment complaints against your client as opposed to Montez? Thank you, Your Honor, for the question. I'd like to clarify that because in terms of quantity, the difference is totally, there's, there's far, far, far more complaints involving Montez's conduct and violations of policy than there were for Dr. Said. In terms of, but let me. Unwanted sexual advances. Let me address that in particular, Your Honor. The, the, the, Dr. Said, and, and this is clear in, in the record and is not disputed, was accused twice of making, basically pursuing relationships with colleagues. Two anesthesiologists in, I think it was October of 2017, that complaint arose. And then a physician assistant he worked in where the complaint arose in late September. And, and the details of a lot of that are hotly disputed in terms of what Dr. Said's conduct involved. But what it, what is not disputed is it involved Dr. Said expressing his love for these individuals and wanting a personal relationship or a more intimate relationship, if you will. Terrible judgment under any circumstances. It is undisputed that Dr. Said never made any physical advance of any kind, never kissed any of these individuals, never engaged in any inappropriate touching or anything like that. He did express his love and, and the district court erroneously concluded that he continued to pursue these women after being instructed. Otherwise, he did nothing of the kind. In fact, he, he, he was specifically credited favorably in 2018 with, with having dealt with and responded to an issue that was considered closed, the prior complaints by Ashkemena and Freetalk. The, the similarly situated standard in those cases I was talking about, the, the Lynn, and there are many cases. I mean, this is the most common way you prove discrimination, by showing disparate treatment. Similarly situated folks being treated. So there are scores of cases. You said two times on your client. How many times on, how do you say, Maltese? Maltese, I believe. Maltese, Your Honor. 10 to 12. Some of the complaints involve an outrageous incident involving a Nurse Calderon and a PAA Julie Holst. And I think some of the complaints are sort of repetitive regarding that. But there are 10 separate written complaints about Maltese. There were two instances where Dr. Said was accused of as. Counsel, again, to cut to the chase, where they have comparable seriousness. You mentioned Rideout. Absolutely. That is the turning point of Rideout, is comparable seriousness. Absolutely, Your Honor. And, and when, when you do that, you look past labels. And, and you, you look at the alleged Maltese conduct. And, and in particular, and, and again, we have to bear in mind we're at the summary judgment stage. All, all inferences get construed in, in Dr. Said's favor. But the, the fact of the matter is, Maltese's conduct, when you look at it, you know, spread out over those 10 to 12 complaints. And, and starting with the very detailed compliance complaint that the Joyce's were unable to leave, Nurse Calderon and PAA Julie Hulse, because of the hostile environment that they alleged he created. He was, he was the subject of a written complaint by another consultant about his inebriated behavior in, in, you know. Were any of the complaints against Dr. Maltese sexual harassment complaints? They, they weren't, if you define that term as seeking a relationship with a colleague. If you define it in that way, they weren't, Your Honor. But sexual harassment is far broader than that. And in fact, as we point out in our briefing, sexual harassment includes bullying, directing conduct that creates a hostile environment towards women. And if you define it in that way, absolutely the complaints about, about Maltese involve that, clearly. Counsel, let's suppose that the comparator was similarly situated. How could it be that he was receiving more favorable treatment when he was terminated from employment? I appreciate the question, Your Honor. Let me address it directly. In August of, of 2018, the decision was made after these 10 complaints, after this terrible 360 review that Maltese had, which, by the way, Said was denied throughout Maltese employment except for one time. And this cultural assessment showed all sorts of difficulties with Maltese. Dr. Duraney, the chair of the department, and Dr. Rehal, the chair of the, the personnel committee, made a decision that Maltese's employment had to end. Just like they did with, with my client three months later, in November, when they believed that the investigation substantiated the complaint against him. The difference is, with Maltese, they give him a six-month termination extension. They basically sit him down and say, you can remain on the job for six months. We're going to pay you. We'll support you in looking for other work. You're leaving at the end of that six-month period. Nothing gets reported anywhere. And my client, by direct contrast, they say, we're going to recommend your immediate termination. Hadn't he previously had some extensions? Help me with that. Your client. Has he had previous administrative actions that amounted to extensions? Thank you, Your Honor. In December of 2017, he was told by Duraney three-month extension. That kept getting extended in 2018 for reasons we still can't understand. But then when that CVS cultural assessment came out, that's a record in the exhibit, they did extend it again even farther out. And that is part of the disparate treatment that lies at the heart of this case. I'm going to reserve the rest of my time for rebuttal, but thank you very much for your questions and attention. Thank you, Mr. Schaffer. Good morning. May it please the court, counsel. My name is Emily McNee, and I'm here with my colleague, Catherine Merkinich-Wilson from Littler Mendelsohn. I'm proud to be here today representing Mayo Clinic and Dr. Duraney because this is a case where Mayo took action to enforce its policies against harassment and offensive behavior in the workplace. As this matter has been extensively briefed, I'll focus on responding to some of the points made by counsel for Dr. Saeed. And I'll focus on three points in rebuttal. First, noticeably absent from Mr. Schaffer's report are two employees who are similarly situated to Dr. Saeed, and that is Dr. Grothy and Dr. Serrano, both of whom... Counsel, do those matter? Under the write-out case, don't you need to find one other employee to have a comparable, serious, similar situated? You can find one, but the fact that there are two here who are similarly situated supports affirmance of the summary judgment... Well, do we have a case that addresses this sort of situation? Do we count noses at this point or something? I'm sorry? Do we count the noses of how many comparators there are in that one? We don't, but the fact that we have two comparators... I understand it's relevant. I'm not arguing with you about relevance. Do we have any cases that talk about this sort of situation? I think if we look at any of the case law on similarly situated standard, Clark of Iranian, I think that would support this. Or, you know, we've also cited... But there are multiple comparators and they may be treated differently? I don't know that there have been cases where they specifically address the multiple comparators. I don't think so either, but I was asking. Go ahead. But I think when you look at the cases that Dr. Saeed points to, you know, there are situations where someone may not have a comparator who matches up, you know, quite so perfectly. But, you know, here we've actually got two who did engage... Well, before you leave, the main issue, was Dr. Saeed treated differently than Dr. Maltice? Maltice? Maltice. Go ahead. Say you say it. Dr. Malte. Thank you. Maltese. So, no, Dr. Malte was not treated more favorably... What about the extensions? ...than Dr. Saeed. So... Address the extensions. In terms of the extensions, in August of 2017, when there were first a set of complaints about Dr. Malte, he was coached about his behavior after HR investigated. And a couple months later, Dr. Saeed is the subject of the complaints by the anesthesiologists, and he, likewise, is coached for his behavior. Then when we get to August of 2018, and the workplace assessment is conducted, Dr. Malte is told at that point he's going to receive a terminal extension for six months longer, and Dr. Saeed is extended and told, we'll give you the opportunity to be considered for promotion in June of 2019. And then only after much more serious misconduct and complaints arise did the recommendation for termination, without any possibility of promotion, follow. Thank you. So, Dr. Malte is simply not a proper comparator here. He didn't engage in similar conduct compared to Dr. Saeed. Well, his behavior caused, I think, two employees to leave the department. So why isn't that as serious as the allegations against Dr. Saeed? I think the record reflects that one employee left the department. And, you know, as to the earlier complaints about Dr. Saeed, it caused an employee involved in that situation to leave as well. Dr. Freitag reported that, you know, one of the reasons she left Mayo is due to the concerns involving Dr. Saeed. But whether or not people choose to leave an employer doesn't show whether the decision made by the employee is sufficiently similar. Well, you heard Mr. Schaefer's description of when I asked the question about sexual harassment and how you define it. What's your response to that? So we're not looking at whether, you know, these employees state a claim for a hostile work environment or whether it would be considered, you know, sexual harassment under the law. But the conduct that Dr. Saeed engaged in is more egregious as a violation of Mayo policy than that that was reported about Dr. Maltais. It's not something that could be construed as sexual harassment. The allegation involving Dr. Maltais is that he pushed or shoved the shoulder of a nurse practitioner as he was exiting an OR. So it's a value judgment by the employer that a sexual harassment allegation is more serious than a physical assault. I'm not saying that's wrong. I'm just saying is that kind of what the... It's one isolated incident versus a series of targeted pattern of behavior. And Dr. Maltais' employment was ultimately separated. So, you know, even if you viewed them as similar in terms of comparable seriousness at that stage of the analysis, he ultimately wasn't treated more seriously than Dr. Maltais. And if you look at the Donald Douglas burden-shifting, there's no evidence from which you could infer that there's been any discrimination against Dr. Saeed based on his race, his religion, or his national origin. And again, if we look to Drs. Grothy and Serrano, both of whom identify as white and are not known to be Muslim or foreign-born, they were investigated for sexual harassment allegations by coworkers. The personnel committee at Mayo made a recommendation to terminate Dr. Grothy. Dr. Serrano retired before a recommendation was made, and both were reported to the Board of Medical Practice. What about the number? Your opponent says 10. On Maltais, only 2 on Saeed. So, first, I think the number isn't necessarily relevant when we take a look at the conduct that's alleged in the complaints. There were a number of different hotline complaints against Dr. Maltais. That's true and in the record. But a number of them came in at the same time and about the same event. And since they came in through an anonymous hotline, we don't know necessarily is that one person making a complaint five times or five separate people. Okay. How many did you say on just the pure number? On the sheer number? Yeah. We are supposed to take the evidence favorable to them, but go ahead and tell me your view. Sure. It can be an estimate, counsel. I think 10 is an accurate reflection of the number of the hotline complaints. So, ultimately, this is a case where Mayo Clinic took action against these complaints of harassment and inappropriate conduct in the workplace against Dr. Said. And he resigned his employment. And I think there are really four key facts that mandate affirmance of the judgment in Mayo's favor. So, first, multiple women complained about Dr. Said's conduct in the workplace in 2017. He was counseled and coached about it. Second, in 2018. Slow down. If you said multiple, multiple sounds like more than two. There are two in 2017. Well, you said multiple women complained. Right. Two women complained in 2017. Oh, two is multiple. Okay. You fooled me. That's how I was thinking of it, Your Honor. I'm sorry. You fooled me with that. Perhaps several or a few might have been better. No, it's okay. We clarified. Proceed. Well, two probably would have been better. Yeah, but go ahead. So, two women. And then in 2018, a new complaint was raised that involved more serious conduct and policy violations. Mayo investigated and substantiated those allegations. Dr. Said resigned before the Termination Review Committee had a chance to review the termination recommendation. But after his employment ended, he did admit to the Board of Medical Practice in a stipulation that he had engaged in inappropriate conduct. And fourth, this action is consistent with how Mayo has treated other similar concerns. Medical decision is in the record here, right? It is, yes. Is there a part of it that's confidential that's not in the record? Is there a part of the... Part of that settlement or whatever it is, whatever they call it in Minnesota, with the disciplinary board that is not in the record? I guess to the extent it hasn't been produced, we don't know what doesn't exist, but the stipulation from the board and the press release are both in the record in Appellee's Appendix Volume 2 at 475. And they don't like... Some states say there's a confidential part of this we're not releasing. These are available to the public, yes. But they don't have an express disclaimer, you know what I'm driving at? Right, there's nothing... Some states on the bottom say that. No names, we're not doing this, we're not doing that. Go ahead. Yeah, I don't believe that that's reflected in those documents. So in closing, as for Dr. Duraney, I'll note that there's no claim on appeal against him individually, so the summary judgment ruling in his favor remains in place. And then as for Mayo Clinic, summary judgment in Mayo's favor on Counts 1 through 7 should be affirmed. Do you have anything further to say on comparable seriousness? Of their two acts. I think that's the key to this case. Are there two... No, comparable seriousness of the acts of the two doctors. I think of comparing Dr. Saeed and Dr. Malte, I don't think they're of comparable seriousness. But even if you conclude that they were, I don't think there's evidence that Dr. Malte was treated more favorably. So we have to look at both of those prongs together. Thank you.  I'll be very brief, Your Honors, but I wanted to pick up on what Judge Benton was asking about what, you know, tell me a little bit more about this comparable seriousness standard. Because that's what the court in, I mean, it was a sort of established in the Lynn v. Deaconess case. And in that case, it involved two nurses that did very, very different things. One of them was accused of a whole litany of things. Tardiness, fault, you know, not doing reports right, just a litany of performance-based issues. And the other nurse that was the comparable, that was the individual that they said, hey, you can't do this to me when you let that person slide, was found many times to have been sleeping on the job. And one of the things that this Court analyzed in saying that this is comparable seriousness was sleeping on the job like that threatens patient's lives, potentially. I mean, that's really serious stuff. When you look into and dive deep into the concerns that were raised about Maltese, you'll see a lot of that. You'll see a lot of issues about, you know, even clinical care. I mean, all sorts of things. And the other thing I just wanted to mention briefly is on October 15th, after Syed had been put on suspension, he, through counsel, through us, wrote a letter saying, you know, look, treat him fairly here. I mean, and that complaint raised these issues of race discrimination. It was, and there was also an independent complaint internally that we didn't even find out about until discovery on this hotline where an individual said, what's going on with how you're treating Syed? Are you doing this because he's a minority employee? I'm paraphrasing, but you'll see it in the record. Neither were ever investigated in any way. In any way. And this Court has said repeatedly, disparities in how and why and what you investigate can be disparate treatment and can be and should be considered that way. All we were asking for in raising those complaints about Syed while the Reed investigation was going on was treat him at parity with how you treated Maltese. You'll see that as well. Mayo had every chance to do the right thing here, and they didn't. And I am not, and maybe that's too flippant, do the right thing. I mean, my client committed egregious errors of judgment in how he behaved towards women in the workplace. I am not here telling you otherwise. All we are asking for and all this claim is based on is exactly what the protections of the law provide. But by treating them the same, Maltese, I think, was given a six-month extension with termination at the end, and I think you said before your client was given at least a three-month one and then some more that was kind of unclear. What are we talking about in reality here, given that they were both ultimately terminated? I'm glad to address that, Your Honor, because let me really make clear what I mean by that. When the decision to terminate was made for Maltese, that's in August. They gave him the six-month termination extension that Rehal said is what we do here at Mayo by policy, except in extraordinary circumstances. What do they do with my client when they make that same decision, we're recommending your termination? They set it for immediate review and approval by the Termination Committee. All we wanted was for him to be told at that time treated in parity with Maltese. We wouldn't be here today if he was. Thank you, Your Honor. Roberts. Counsel, thank you for your appearance and briefing. Case is submitted and we'll issue an opinion in due course. Ms. O'Keefe, does that conclude the Court's docket for the week? Yes, Your Honor. The Court will be in recess until further call.